UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

PATSY L. JOHNSON,               )
                                )
          Plaintiff,            )
                                )
     v.                         )          No.  2:12CV88 TIA
                                )
CAROLYN W. COLVIN,              )
ACTING COMMISSIONER OF          )
SOCIAL SECURITY,                )
                                )
          Defendant.            )

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the

denial of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the

Social Security Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28

U.S.C. § 636(c).

**I.  Procedural History**

On August 5, 2009, Plaintiff filed an application for Supplemental Security Income,

alleging that she became disabled on August 12, 2008, due to Type 1 Diabetes; neuropathy;

retinopathy; Fibromyalgia; pain in knee, ankle, and shoulder; Pancreatitis; blackouts; depression;

and anxiety.  (Tr. 10, 106, 162-68)  The application was denied on January 12, 2010, after which

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 102-03, 106-10,

114)  On June 2, 2011, Plaintiff testified at a video hearing before the ALJ.  (Tr. 39-65)   In a

decision dated June 24, 2011, the ALJ found that Plaintiff had not been under a disability since

August 5, 2009, the date she filed her application.  (Tr. 10-34)   After considering additional

evidence, the Appeals Council denied Plaintiff's request for review on November 6, 2012.[1]  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Subjective Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Plaintiff's attorney first questioned the Plaintiff, who testified that she was 29 years old.  She was separated and had two children, ages eight and five.  Plaintiff weighed 210 pounds and measured 5 feet 6 inches.  Her weight had decreased from about 245 pounds, which she attributed to diabetes and sickness.  Plaintiff completed the 12th grade and graduated from high school.  (Tr. 45-47)

According to Plaintiff, she had been using insulin to treat her diabetes for about two years.  She took the insulin as prescribed.  However, she testified that she missed some appointments with Dr. Wells due to car problems and hospitalization.  Dr. Wells then informed Plaintiff that she missed too many appointments and let her go.  Plaintiff tried to stretch out her insulin until she found another doctor one month later.  Plaintiff stated that she reduced her insulin intake by half in March or April of 2010, which placed her in a diabetic coma.  Despite taking her insulin as prescribed, her blood sugar was high, over 600, at least once a day.  Plaintiff then experienced fatigue, headaches, blurred vision, and stomach aches with vomiting.  She would take an insulin injection, which took about two to five hours to reduce her blood sugars.  Although the headaches subsided in a few hours, the stomach ache could last a few days.  Plaintiff stated that she had about six or seven diabetic ketoacidosis ("DKA") events over the past five months, which resulted in five hospitalizations.  During a DKA, Plaintiff's speech was slurred, she was sleepy and incoherent, she vomited a lot, and she was in pain.  (Tr. 47-51)

---

[1]  The Appeals Council noted that the additional information did not provide a basis for changing the ALJ's decision.  (Tr. 1-2)

Plaintiff further testified that her blood sugars were low about once or twice a week. When this occurred, she became hungry, sweaty, and sleepy. She also experienced headaches. Plaintiff stated that she would sleep for about two hours, and the headaches lasted about two to three hours. In April of 2009, doctors changed the status of Plaintiff's diabetes from Type II to Type I, which meant that her body made no insulin. (Tr. 51-53)

Plaintiff was also diagnosed with fibromyalgia. She experienced symptoms in her legs that felt like shock-waves. The pain went from her ankles to her knees, up to her lower back, and into her shoulders. Dr. Jessica Town made the fibromyalgia diagnosis. Plaintiff further testified that the fibromyalgia caused low energy which required regular naps in addition to naps stemming from low blood sugar. Plaintiff napped twice daily from 11 to 12:30 and then from 4:30 to 6. Plaintiff went to bed between 9 and 10 but was unable to sleep at night. She stated that she took two to three hours to fall asleep but woke up every hour due to cramping and stomach aches. During the school year, she woke up at 7 to get her son to school and then rested on the couch until her daughter woke up around 9. (Tr. 53-55)

In addition, Plaintiff testified that she experienced migraine headaches about twice a month. The migraines differed from headaches related to blood sugars. Plaintiff stated she could not move and was sensitive to light. She had nausea without vomiting. The migraines lasted about one or two days. Plaintiff further listed several medications that she took for her various symptoms. Plaintiff took Pristique; Gabapentin for nerve pain; Omeprazole for stomach problems; Humalog and Lantus for diabetes; Lorazepam for anxiety; Prilosec for stomach problems; levothyroxine sodium for her thyroid; and Naproxen sodium. Plaintiff took her medications as prescribed. Her only side effect was fatigue. (Tr. 55-57)

The ALJ also questioned the Plaintiff about her diabetes. The ALJ wondered why

Plaintiff's blood sugars were not regulated despite insulin compliance. According to Plaintiff, her doctor said that her pancreas and liver stopped producing insulin. If she skipped a meal, her insulin levels would change. Plaintiff sometimes missed meals or ate at different times due to her daily schedule. Both Plaintiff's children attended school, and her son played baseball. In addition, Plaintiff's mother was ill and required transportation to doctor's appointments. (Tr. 57-60)

The ALJ also questioned Plaintiff about her ability to perform exertional activities. Plaintiff stated that she was not supposed to lift anything over five pounds due to degenerative spinal and disc disease. Further, she became dizzy upon standing and needed to sit down. She became uncomfortable when sitting due to pressure from her back and legs, requiring her to stand. Plaintiff believed she could stand for 10 to 20 minutes before she had to sit down. She could sit for 30 to 45 minutes before needing to stand. (Tr. 60-61)

A Vocational Expert ("VE") also testified at the hearing. The ALJ asked the VE to assume a hypothetical individual with a high school education and the same past relevant work as the Plaintiff. The person required a sit/stand option and could lift only five ponds. Further, she needed to lie down twice a month for one to two days at a time in a dark room due to migraines. The individual's blood sugars varied every day, causing at least one high blood sugar, with blurred vision and vomiting. One or two time a week, the person experienced low blood sugars which caused fatigue and headaches. The aftereffects from the low blood sugars lasted about an hour, and the aftereffects from the highs lasted from a couple days to a week. In addition, the individual needed to lie down when her blood sugars were high or low. Given these limitations, the VE testified that the person could not perform Plaintiff's past work or any other work. (Tr. 61-63)

For the second hypothetical, the ALJ asked the VE to assume an individual that was 29 years old, needed to be absent once a month, and had a high school education. Further, this person required a sit/stand option and could lift five pounds. She required simple work with one to two-step operation, limited amount of stress, and no production quotas. In light of this hypothetical, the VE testified that the individual could not perform Plaintiff's past work or any work. However, if the once a month absence was intermittent instead of consistent, the person could perform the position of sorter, which was sedentary and unskilled. (Tr. 63-65)

### III. Medical Evidence

Plaintiff was diagnosed with diabetes on October 25, 2008, after having gestational diabetes during two pregnancies. (Tr. 737-39) On December 10, 2008, Plaintiff was hospitalized due to uncontrolled diabetes. John Memken, M.D., noted that Plaintiff had been noncompliant with her insulin prescription by only taking insulin every other day, sometimes every third day. Plaintiff alleged that she was stretching out the medication due to lack of funds, despite receiving free samples to allow Plaintiff to take the insulin daily. (Tr. 697-700)

Plaintiff was admitted to the hospital on April 28, 2009 for acute pancreatitis. Jessica Town, D.O., noted that Plaintiff's blood sugars were high, ranging from 300 to 600. (Tr. 294) Upon discharge, Dr. Town assessed acute pancreatitis, resolved; diabetes type 2, uncontrolled; hypertriglyceridemia; hypothyroidism; and depression. Dr. Town also noted that she would likely start Plaintiff on an antidepressant. (Tr. 497-98)

On May 4, 2009, Plaintiff returned to the ER for complaints of abdominal pain. She was admitted after a diagnosis of hyperglycemia with metabolic acidosis. Plaintiff required a lot of Diluadid for pain. In addition, a social worker consulted with Plaintiff and prescribed Prozac after discussing coping issue, noncompliance, and home stress. Discharge diagnoses were

recurrent pancreatitis; uncontrolled type 2 diabetes; uncontrolled hypertriglyceridemia; depression; and hypothyroidism. (Tr. 492) Again, on May 14, 2009, Plaintiff presented to the ER with abdominal pain, elevated blood sugars, and anion gap acidosis. A diabetes educator discussed the importance of taking her insulin every day. A psychiatric consultation revealed no signs or symptoms of psychosis. Her mood and affect were a mixture of anxiety and dysphoria. Lee Johnson, M.D., assessed major depression, recurrent, nonpsychotic, severe; insulin-dependent diabetes mellitus; and a GAF of 60. Plaintiff was discharged with the following diagnoses: chronic pancreatitis; diabetic ketoacidosis; hypertriglyceridemia; depression; hypokalemia, resolved; and anion gap metabolic acidosis. (Tr. 476-80)

Plaintiff was admitted to the hospital again on May 28, 2009, complaining of dizziness, hypoglycemia, and severe abdominal pain radiating to her chest. Plaintiff reported falling while chasing a dog. Plaintiff was interested in obtaining an insulin pump. Dr. Town assessed epigastric pain; chronic pancreatitis; status post esophagogastroduodenoscopy; insulin-dependent type 2 diabetes, uncontrolled; hypertriglyceridemia; and hypothyroidism. (Tr. 457-66)

On June 6, 2009, Plaintiff was admitted to the hospital for nausea, vomiting, and abdominal pain. Stuart Pyatt, D.O., admonished Plaintiff for smoking, especially in light of her poorly controlled diabetes and vascular complications. (Tr. 447-48, 455) Plaintiff was again admitted to the hospital on June 11, 2009 for uncontrolled diabetes with diabetic ketoacidosis and chronic abdominal pain. Plaintiff received pain medication and dietary counseling. The physicians did not believe Plaintiff was a good candidate for long-term narcotics. The primary diagnosis was acute diabetic ketoacidosis, which was resolved while Plaintiff was hospitalized. Dr. Town also diagnosed uncontrolled type 1 diabetes. (Tr. 438-44)

Plaintiff followed up with Dr. Town on June 24, 2009, reporting fasting blood sugars that

ranged from 69-300.  Plaintiff complained of dizziness upon standing, blurred vision, and a feeling of heaviness in her body.  Dr. Town noted a positive Romberg test and unstable gait.  Dr. Town assessed type 2 diabetes, uncontrolled, and chronic abdominal pain.  (Tr. 293) The following day, Plaintiff presented to the ER for complaints of abdominal pain.  Her blood sugar was over 400.  Plaintiff was admitted to the hospital and continued to request narcotic pain medication.  A psychiatric consultation resulted in a recommendation that Plaintiff transfer to the psych unit.  Plaintiff had multiple narcotic prescriptions at pharmacies in Illinois and Missouri, and she continued to complain of severe pain even though physical examination failed to reveal any supporting evidence of pain.  Plaintiff was discharged to the psychiatric unit with diagnoses of abdominal pain and nausea, stable; hyperlipidemia, stable; hypothyroidism, stable; depression, severe; tobaccoism; diabetes mellitus type 2, possibly type 1, stable; and narcotic abuse and addiction.  (Tr. 433-35)  While in the psych ward, Plaintiff denied a history of abusing her pain medication.  Plaintiff attended group and individual counseling sessions.  Upon discharge, Plaintiff was improved and stable, with diagnoses of major depressive disorder, moderate, recurrent, without psychotic features; diabetes; obesity; hyperlipidemia; pancreatitis; and GAF or 50.  She was currently separated from her husband and involved in a custody battle over the children.  (Tr. 420-21)

On July 10, 2009, Plaintiff complained of dizziness upon standing and blurred vision. She reported that her moods were okay.  Her blood sugars continued to be uncontrolled, often reading in the 400s.  Dr. Town assessed diabetes mellitus type 1, uncontrolled; dysequilibrium; and frequent falls.  Dr. Town planned to pursue obtaining an insulin pump and asked Plaintiff to bring in a written log of blood sugar levels.  (Tr. 289-90)  Plaintiff returned to Dr. Town on July 20, 2009 for complaints of uncontrolled diabetes and abdominal pain.  Plaintiff asked to be

hospitalized for pain control. She did not write down her insulin intake or sugar levels. Dr. Town opined that Plaintiff's vertigo was secondary to out of control blood sugars. She prescribed medication and advised Plaintiff to write down how much insulin she gave herself. (Tr. 287-88)

Plaintiff was admitted to the hospital on July 26, 2009 for complaints of abdominal pain, nausea, and vomiting. Plaintiff's pain medications were discontinued as ineffective. Plaintiff continued to request IV pain medication, which Dr. Town denied. Dr. Town strongly encouraged Plaintiff to keep her pain clinic appointment set for July 31. Plaintiff also attended a physical therapy appointment. Carolyn Bergstrom noted that objective findings did not fully support Plaintiff's subjective complaints of dizziness, pain, and lightheadedness. Further, an occupational therapy evaluation revealed an inconsistent level of assistance with presenting symptoms. Joahnes Gatdula planned to monitor Plaintiff closely to get an accurate level of functioning. (Tr. 395-406)

Plaintiff called Dr. Town's office on July 29, 2009 to request a refill of Lortab. Notes indicate that Plaintiff should not be out of per pain medication that early, so the request was denied. On August 4, 2009, Plaintiff called again to make an appointment for August 13 to obtain Lortab refills. (Tr. 287) Plaintiff returned to Hannibal Clinic on August 7, 2009. Dr. Memken noted he had not seen Plaintiff for 8 months. She saw Dr. Memken because she was trying to get disability and was unable to work. She also sought a hydrocodone refill for chronic abdominal pain. Plaintiff told Dr. Memken that her appointment with Dr. Town was three weeks away, and Dr. Town refused to see her before then or refill her medication. In fact, Plaintiff indicated that Dr. Town suggested she see Dr. Memken for a refill. Dr. Memken found this bizarre but refilled the prescription, noting that he would not do so again. He noted that Plaintiff did not appear to be in any kind of acute distress but winced with the slightest palpation of her abdomen. He assessed

diabetes; hypothyroidism; pancreatitis; anxiety with depression; and fibromyalgia. (Tr. 272-73)

Plaintiff was admitted to the hospital on August 12, 2009 after she was found trembling and unresponsive at home. Dr. Town noted that Plaintiff repeatedly canceled appointments to learn how to use her insulin pump, despite Plaintiff's report that she was unable to get a hold of information to show her how to use it. Pump records suggested that Plaintiff was intentionally overdosing herself with the insulin pump. Doctors removed the pump from Plaintiff and placed her on her previous insulin regimen. Although Plaintiff denied using the insulin pump to try to hurt herself, she admitted to psychiatry that she was severely depressed and agreed to be transferred to psychiatry when her blood sugars were stable. In addition, neurology tested for an underlying seizure disorder but determined that the seizures were initiated by the hypoglycemia. Plaintiff's diagnoses included hypoglycemic seizures; probable factitious disorder; uncontrolled type 1 diabetes; hyperlipidemia; hypothyroidism; and anxiety. (Tr. 381-82)

While hospitalized in the psychiatric unit, Plaintiff reported that she had been depressed due to her husband's infidelity and her illnesses. Plaintiff complained of pain all over despite unremarkable CAT scan and x-rays. Plaintiff was diagnosed with depressive disorder, not otherwise specified; personality disorder with borderline personality features; chronic pain, fibromyalgia, diabetes; and a GAF of 50. Plaintiff was discharged on August 24, 20119, and her mental status on discharge indicated appropriate speech, neutral mood, and appropriate affect. (Tr. 370-71)

Plaintiff presented to the ER three days later, on August 27, 2009. She complained of abdominal pain, vomiting, and high blood sugar. Plaintiff was admitted due to a diagnosis of diabetic ketoacidosis. During her admission, Plaintiff could not verbalize her insulin orders, although she stated she took her insulin as prescribed. She also admitted to taking a higher dose

of pain medication than prescribed. Plaintiff did not received IV or oral narcotics. Dr. Paula Mackrides noted that Plaintiff failed to keep an appointment with pain management. In addition, Plaintiff typically requested discharge when she was denied IV narcotics. Dr. Mackrides also noted that she was unable to find a record of a formal fibromyalgia diagnosis. A consultation with Dr. Joseph Kuhlman, a pain management doctor, revealed chronic abdominal pain. He recommended that Plaintiff see a GI doctor at a different hospital, as the present hospital did not have a handle on why Plaintiff experienced chronic abdominal pain. Dr. Kuhlman was hesitant to raise her narcotic amount but would consider increasing her Lyrica and Cymbalta. Discharge diagnoses were diabetic ketoacidosis, resolved; uncontrolled type 1 diabetes; severe depression; anxiety; chronic nonorganic abdominal pain; hypothyroidism; history of factitious disorder; history of hypoglycemic seizures; history of pancreatitis. (Tr. 349-364)

On September 2, 2009, Plaintiff returned to the ER complaining of abdominal pain. She also experienced uncontrolled vomiting. Diagnosis was viral gastroenteritis. Plaintiff was advised to keep her followup appointments. (Tr. 346-47) Again, on September 7, 2014, Plaintiff presented to the ER complaining of nausea and abdominal pain. She was in diabetic ketoacidosis and required an insulin infusion. Plaintiff was hospitalized overnight. The following morning, she continued to complain of chronic abdominal pain and received one dose of Dilaudid. Psychiatric evaluation revealed a lousy mood and mildly constricted affect. Plaintiff had impaired insight into her medical and psychiatric problems. Dr. Milena D Djuric noted that tests could not identify organic causes of Plaintiff's pain, which led to a diagnosis of pain disorder secondary to psychological factors. Dr. Djuric opined that Plaintiff tended to somatize her anxiety and depression problems. Dr. Djuric assessed depressive disorder, not otherwise specified; pain disorder associated with psychological factors; rule out fictitious disorder; cluster

10

B personality disorder, borderline type; and a GAF of 45. Dr. Djuric offered inpatient treatment but Plaintiff declined. Thus, Dr. Djuric recommended weekly psychotherapy and an appointment at a pain clinic. (Tr. 338-42)

Plaintiff was hospitalized again on September 12, 2009 with diabetic ketoacidosis, which was worse than previous admissions. Discharge instructions included seeing Dr. Town twice weekly, keeping a food diary and bringing the diary and meter to all appointments, keeping her appointment at Mark Twain health center, and continuing Cymbalta and pain medications. Diagnoses on discharge were diabetic ketoacidosis, resolved; uncontrolled type 1 diabetes; depression; chronic nonmalignant pain syndrome; hyperlipidemia; hypothyroidism; nausea and vomiting; nocturnal hyperglycemia; and polypharmacy. (Tr. 329-30)

Plaintiff was admitted for the 16th time in 2009 on September 28, 2009. Her blood glucose level was 530 at admission. She received insulin to resolve the diabetic ketoacidosis. The admitting physician opined that Plaintiff could have some factitious disorder or Munchausen's Syndrome. Plaintiff was advised to keep outpatient appointments, as she had missed three between her last hospitalization and this one. (Tr. 321-25)

Plaintiff's October 6, 2009 hospitalization resulted in a diagnosis of factitious disorder. Dr. Mackrides noted that, despite recommended outpatient follow-up, Plaintiff had been nonadherent. A psychiatric consultation indicated that Plaintiff never followed up with psychiatric or pain management appointments. Plaintiff's mood was depressed, and her affect was blunted and appropriate. Her judgment was impaired. Dr. Djuric strongly encouraged Plaintiff to pursue outpatient psychotherapy. Plaintiff was discharged with instructions to follow up with her primary provider, continue insulin therapy, and follow up with psychiatry. However, Dr. Mackrides noted that due to poor patient adherence to a follow up plan, her prognosis was

11

guarded to poor.  (Tr.  316-20)

On October 21, 2009, Plaintiff presented to the ER with nausea, vomiting, and abdominal pain.  Her primary care physician informed the ER that Plaintiff had not refilled her insulin since April.  Plaintiff reported that she smoked one-half to one pack of cigarettes a day and was not willing to quit.  Dr. May Kim noted that, due to Plaintiff's multiple admissions with hyperglycemia, it was questionable whether Plaintiff was compliant with taking her insulin.  (Tr. 309-11)

Plaintiff walked into the ER on December 1, 2009 complaining of abdominal pain, vomiting, back pain, and blurred vision.  (Tr. 518)  She returned to the ER on March 3, 2010 with vomiting and leg cramps.  She was diagnosed with hypoglycemia and right leg cramps.  (Tr. 521-23)

Another ER visit on April 10, 2010 resulted in a diagnosis, *inter alia,* of type 1 diabetes mellitus, long standing, uncontrolled; diabetic neuropathy; and history of drug seeking behavior. The physician, Dr. Scott R. Kimber, noted that Plaintiff was without a physician because Plaintiff had recently been terminated from Dr. Wells' care due to noncompliance with follow up visits. She reported that she had been trying to ration her insulin and was taking less than the prescribed dosages.  Plaintiff was admitted for to ICU status diabetic ketoacidosis.  On exam, Plaintiff had diffuse tenderness of her upper and lower back.  She was hypersensitive to any palpation or stimulus.  Dr. Kimber noted that Plaintiff's longstanding history of medication noncompliance made her long term management difficult.  Plaintiff was advised to follow up with a primary care physician and control her diabetes to reduce the risk of significant complications.  (Tr. 564-69)

Plaintiff established care with Buthaina Richeh, M.D., on April 20, 2010.  Plaintiff reported that she only took her insulin if her sugar was really high.  She also stated that no pain

12

medication helped her leg pain, yet acknowledged that she never saw a pain specialist. In addition, despite a history of anxiety and depression, Plaintiff never saw a psychiatrist. Dr. Richeh noted that Dr. Memken no longer wished to see Plaintiff because she was mostly seeking pain medication and was noncompliant. Dr. Richeh recommended that Plaintiff continue her insulin regimen and be seen by Endocrine and Psychiatry. Dr. Richeh told Plaintiff that she needed to be compliant or it would be hard to take care of her. (Tr. 476-80)

Plaintiff followed up with Dr. Richeh seven months later on November 23, 2010. Plaintiff reported that she had moved to Seattle with her husband and children but returned because her husband was abusive. She reported head, back and leg pain and stated that over-the-counter medications did not help. Review of systems was negative except for heat intolerance and right ankle pain and swelling after an injury. Plaintiff reported a couple hospitalizations in Seattle and a recent admission to Blessings Hospital. Dr. Richeh noted that Plaintiff was noncompliant with diet and with physician. (Tr. 781-83)

On December 9, 2010, Plaintiff presented to the ER and was admitted for diabetic ketoacidosis. She had gastrointestinal illness with poor oral intake and hyperglycemia. Plaintiff exhibited full range of motion in all four extremities. Plaintiff received an insulin infusion and was discharged in stable condition, with instructions to follow up with Dr. Richeh. (Tr. 586-90)

Plaintiff returned to the ER on December 14, 2010 for complaints of nausea, vomiting, and abdominal discomfort. Her blood sugar was elevated to 698. She was discharged with a diagnosis of uncontrolled diabetes, improved; pneumonia; and abdominal pain. (Tr. 604-08) Plaintiff again visited the ER on December 25, 2010, complaining of vomiting. She reported that her blood sugar was too high to read. Her glucose was elevated at 639. She was admitted to ICU and placed on IV insulin. Dr. Dan H. Evans assessed diabetic ketoacidosis; abdominal pain,

13

recurrent nausea, vomiting, probably related to diabetic gastroparesis; recent diagnosis of pneumonia; multiple electrolyte imbalance; hypothyroidism; depression; gastroesophageal reflux disease and reflux; history of pulmonary module; obesity; and tobaccoism.  (Tr. 621-26)

Plaintiff was hospitalized from December 28, 2010 through January 3, 2011 for diabetic ketoacidosis after falling down.  She was noncompliant and overweight.  EKG showed sinus tachycardia, and a CAT scan revealed a patchy peripheral consolidation in the dependent left lung base, indicating underlying small pneumonia.  Plaintiff was on a diabetic diet with no activity restrictions.  Plaintiff was discharged in improved condition with instructions to follow up with Dr. Richeh in one week.  (Tr. 628-95)

Plaintiff was admitted to the hospital four more times in 2011.  On January 28, 2011, Plaintiff complained of high blood sugars with headache and some left flank pain.  She also had episodes of vomiting.  The treating physician was unsure whether the high blood sugars were attributable to noncompliance or infection.  The physician advised her to resume medications as prescribed by Plaintiff's original physician.  She was to follow a diabetic diet, lift no more than five pounds for two weeks, and follow up with her primary care doctor in one week.  (Tr. 830-34)

She was again admitted on February 5, 2011 with diabetic ketoacidosis.  Plaintiff was unable to report what her sliding scale was.  She swore that she was compliant with insulin and caught infections from her children.  She also complained of back and abdominal pain.  Plaintiff was treated and later discharged with no complaints.  She was provided oral pain medication therapy and insulin.  In addition, Dr. Hammad Hussain thought a psychiatric consultation would be prudent.  (Tr. 835-38)  By February 7, 2010, Plaintiff was doing well with no complaints other than back pain.  Lumbar MRI showed narrowing of the L5-S1 disc space with a modest protrusion to the right of the L5-S1 disc compromising the right S1 nerve root.  The thoracic MRI

14

revealed a small right-sided disc prolapse/protrusion at T5-7 indenting the thecal sac and coming in contact with the spinal cord. Smaller protrusions were noted at T7-8 and T10-11 that indented the thecal sac without effect on the spinal cord. The disc protrusions were of uncertain clinical significance and did not seem to be the cause of Plaintiff's pain. Dr. Reuben P. Morris recommended physical therapy, weight loss, and consideration of specific treatment for fibromyalgia. She was not a candidate for surgery. Plaintiff was discharged to home with instructions to follow up with her doctor in two weeks. (Tr. 842-53)

On February 14, 2011, Plaintiff was again admitted for diabetic ketoacidosis after complaining of abdominal pain, nausea, vomiting, and uncontrolled sugar. She received an insulin drip. On that same date, Dr. Joseph Kuhlman evaluated Plaintiff for rib, chest, hip, and low back pain. Plaintiff reported doing okay at the time. Physical examination revealed diffuse musculoskeletal pain with palpation in the lower extremities, back, and legs. She displayed good strength with the dorsi and plantar flexion at the ankle bilaterally. There was some pain with subcutaneous palpation of lower back and hip area, with some positive Waddell's signs. She also had some pain with external rotation at the hip bilaterally, but not with internal rotation. Straight leg raise was negative, and she exhibited diffuse abdominal pain with palpation. Dr. Kuhlman's impression was generalized musculoskeletal pain. He did not think Plaintiff was a good candidate for chronic opioids. He suggested several different medications, as well as a rheumatologic consult, but Plaintiff did not like Dr. Kuhlman's suggestions. He also advised her to quit smoking and decrease her caffeine intake. Dr. Kuhlman explained that he did not have a magic pill and that Plaintiff would need to deal with chronic issues on a daily basis. By February 17, 2011, Plaintiff was doing fairly well with no complaints except for pain. She was discharged with pain medications, insulin, and psychotropic medications. (Tr. 854-67)

Plaintiff returned to the hospital on February 27, 2011 with complaints of nausea, vomiting, and abdominal pain. She also had a headache and dark urine. Plaintiff was diagnosed with diabetic ketoacidosis and admitted. Dr. Hussain performed a consultation and noted that Plaintiff denied noncompliance but had been reminded many times of the consequences of repeated DKAs. Plaintiff explained that as soon as she started throwing up, her blood sugars rose significantly. Dr. Hussain assessed diabetic ketoacidosis; mixed dyslipidemia; hypertension; and chronic pain. While in the hospital, Plaintiff consulted with a physical therapist regarding her back pain. Plaintiff reported injuring her back shoveling snow three weeks prior. Physical examination was normal. The physical therapist advised Plaintiff of back protection principles and exercises. In addition, the therapist recommended that Plaintiff avoid lifting more than 4 pounds; avoid sitting for more than 15 minutes at a time; and ambulate several times a day with a walker. Plaintiff remained hospitalized until March 5, 2011. She was discharged in stable condition with an oral pain medication regimen. (Tr. 888-907)

On March 23, 2011, Plaintiff saw Dr. Alex H. Kosloff to establish a primary care physician. Plaintiff complained of diabetes related symptoms, as well as fibromyalgia, depression, and syncope. Upon examination, Plaintiff's abdomen was non-tender. Her strength and ambulation were normal. Dr. Kosloff assessed diabetes mellitus type 1, uncontrolled; fibromyalgia; depression; degeneration, thoracic disc; and nausea with vomiting. He prescribed medication and advised Plaintiff to return in one week. (Tr. 916-19)

Plaintiff returned to Dr. Kosloff on April 4, 2011 for a recheck. Plaintiff reported high blood sugar readings that were better but became higher when she was sick to her stomach. Plaintiff forgot her readings at home. Musculoskeletal exam revealed decreased range of motion, joint pain, joint stiffness, muscle pain, fibromyalgia, and decreased movement. The abdomen was

non-tender on palpation. Dr. Kosloff assessed fibromyalgia; nausea with vomiting; and diabetes mellitus type 1, uncontrolled. (Tr. 912-14)

When Plaintiff returned on April 12, 2011, she reported fasting home glucose readings of over 250, with a couple over 300. She did not feel well and complained of fatigue and body aches. Musculoskeletal exam revealed decreased range of motion, joint pain, joint stiffness, muscle pain, fibromyalgia, and decreased movement. Dr. Kosloff assessed lung nodules; diabetes mellitus type 1, uncontrolled; fibromyalgia; and depression. (Tr. 909-11)

The Appeals Council also considered additional medical evidence not before the ALJ. This evidence consisted primarily of return visits to Dr. Kosloff to monitor her diabetes, as well as well as several hospital visits for pain and high blood sugars. (Tr. 941-1038)

### IV. The ALJ's Determination

In a decision dated June 24, 2011, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 5, 2009, the application date. Further, the ALJ determined that Plaintiff's severe impairments included type I diabetes; generalized musculoskeletal pain; history of pancreatitis; and depression. The ALJ thoroughly assessed all the medical evidence contained in the record and found that Plaintiff did not have an impairment of combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ applied the old listing for diabetes mellitus, which was in effect at the time of the hearing, and noted that, although Plaintiff was hospitalized several times, she had less than the required hospitalization frequency and was noncompliant with medication and diet. Further, the ALJ assessed Plaintiff's mental impairments in light of listing 12.04 and determined that Plaintiff's problems stemmed from stressors, such as her divorce and medical problems. (Tr. 10-28)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform unskilled, sedentary work with the exception that she must be allowed to sit or stand and is limited to lifting only five pounds. The ALJ further found that Plaintiff was unable to perform any past relevant work. However, given her younger age, high school education, work experience, and RFC, the ALJ determined that a significant number of jobs existed in the national economy which Plaintiff could perform. Thus, the ALJ concluded that Plaintiff was not under a disability, as defined by the Social Security Act, since August 5, 2009. (Tr. 28-34)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" <u>Cruse v. Chater</u>, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record <u>de novo</u>. <u>Id.</u> at 1328 (citing <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. <u>Id.</u> at 1320; <u>Clark v. Chater</u>, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-586 (8th Cir. 1992); <u>Brand v. Secretary of Health Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. <u>Id</u>. at 1354; <u>Ricketts v. Secretary of Health</u>

& Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, the Plaintiff asserts that the ALJ erred in failing to find that Plaintiff's diabetes mellitus type I met or equaled Listing 9.08; failing to comply with regulations in determining that Plaintiff was noncompliant with prescribed treatment; failing to support the RFC assessment with medical evidence from treating physicians; failing to resolve the conflict between the VE's testimony and the Dictionary of Occupational Titles; and performing an erroneous credibility determination. Defendant, on the other hand, contends that the ALJ properly determined that Plaintiff did not satisfy Listing 9.08; properly considered Plaintiff's noncompliance; properly evaluated Plaintiff's credibility; properly determined Plaintiff's RFC; and properly relied on the VE's testimony. The undersigned finds that substantial evidence supports the ALJ's determination such that the final decision of the Commissioner should be

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

affirmed.

## A. Whether Plaintiff's Diabetes Mellitus Type I met Listing 9.08

Plaintiff first argues that the ALJ erred in finding that her diabetes mellitus type I did not meet or medically equal Listing § 9.08(B), which at the time of the decision provided that a claimant was disabled if she had diabetes mellitus with "[a]cedosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or pCO2 or bicarbonate levels)." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08 (2010). The Defendant asserts that, although Plaintiff experienced multiple episodes of acidosis resulting in hospitalization, the episodes were not caused by uncontrollable diabetes but by Plaintiff's persistent noncompliance with diet, insulin, and other medications, as well as her failure to follow up with physicians as instructed.

As set forth in the medical evidence above, the record is filled with consistent medical entries indicating Plaintiff's failure to take her insulin or keep track of her daily intake and glucose levels. In addition, Plaintiff was hospitalized on one occasion after intentionally overdosing on insulin. (Tr. 16, 381) Plaintiff also failed to comply with a diabetic diet. (Tr. 370) In addition, she failed to attend scheduled follow-up visits (Tr. 564) Indeed, one of the most recent hospitalizations garnered a remark from Dr. Hussain that even though Plaintiff denied noncompliance, she had been reminded many times of the consequences of repeated DKAs. (Tr. 892)

Plaintiff argues that the new evidence she submitted demonstrates her compliance with a diabetic diet and medication regimen during the applicable time period, such that she meets the listing. Under the regulations, the Appeals council considers new evidence where it is material to the issue decided by the ALJ. 20 C.F.R. § 404.970(b). Material evidence is evidence that is

relevant to a plaintiff's condition for the time period during which the ALJ denied benefits.

Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).  Further, the Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the additional evidence in question was not material. Aulston v. Astrue, 277 F. App'x 663, 664 (8th Cir. 2008) (citation omitted).  Here, while Plaintiff may have become more compliant with diet, medications, and tracking after the ALJ issued the determination, this evidence does not negate the consistent findings by multiple doctors during the relevant time period that Plaintiff was noncompliant. See e.g., Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) (finding that the new records submitted by the plaintiff described her condition on the date the records were prepared and not on an earlier date; thus, the records were not material).

Instead, the overwhelming evidence in the medical records shows that Plaintiff's repeated episodes of and hospitalizations for acedosis were attributable to noncompliance with recommended treatment.  "Impairments that are controllable or amenable to treatment do not support a finding of total disability."  Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999).  In order for a plaintiff to obtain social security benefits, a plaintiff must follow the treatment prescribed by her physician.  20 C.F.R. § 416.930.  Failure to do so precludes a plaintiff from receiving benefits.  Id.; SSR 82-59, 1982 WL 31384, at *1 (Soc. Sec. Admin. 1982).  As will be developed more fully below, the ALJ properly found that Plaintiff's noncompliance with prescribed treatment in this case precluded her from meeting the listing.  Thus, the undersigned finds that the ALJ did not err in finding that Plaintiff did not meet Listing 9.08.

## B.  Whether the ALJ Properly Applied SSR 82-59

Under SSR 82-59, the Social Security Administration may determine that an individual

has failed to follow prescribed treatment where all of the following conditions exist:

> 1.  The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and

> 2.  The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

> 3.  Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

> 4.  The evidence of record discloses that there has been refusal to follow prescribed treatment.

> Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

SSR 82-59, 1982 WL 31384, at *1 (Soc. Sec. Admin. 1982).

Here, the ALJ properly considered these factors and determined that Plaintiff failed to follow prescribed treatment which precluded a finding of disability. First, the ALJ noted that the hospital records documented acedosis at the frequency required by the listing. (Tr. 26) Plaintiff's diabetes had lasted, and was expected to last, for at least 12 months. (Tr. 26) However, the ALJ also thoroughly assessed the medical evidence, which demonstrated that Plaintiff's physicians prescribed insulin treatment that would restore her capacity to engage in gainful activity. (Tr. 12-25) Further, the ALJ noted that Plaintiff was able to care for her children when she was not experiencing a diabetic crisis. (Tr. 29) Most importantly, the ALJ extensively documented Plaintiff's refusal to follow prescribed treatment. (Tr. 30-31) Plaintiff's doctors assessed persistent noncompliance with prescribed treatment, which included failure to follow a proper

diet, failure to properly use her medication, and failure to follow up with her doctors.  (Id.)

Plaintiff argues, however, that she was justified in not complying because she did not have funds to pay for her medication.  The undersigned disagrees that her noncompliance was justifiable.  The Defendant points out that Plaintiff had been referred to Social Services to explore options for financial assistance to deal with her illness, yet there is no indication that Plaintiff sought such assistance and was refused.  (Tr. 741)  Further, physicians provided free medication, but Plaintiff elected not to take the medication as prescribed.  (Tr. 269, 697) Given this evidence, the ALJ properly determined that Plaintiff's financial hardship was not severe enough to justify her failure to follow prescribed treatment.  See Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (finding that evidence supported the ALJ finding that plaintiff's financial difficulties were not severe where plaintiff did not seek low-cost medical treatment and was not denied medical care due to her financial condition).

Plaintiff also contends that her noncompliance was due to the fact that she was a mother of two young children, and she also cared for her sick mother.  Plaintiff argues that she was sometimes too busy caring for others to properly care for herself.  Plaintiff's ability to care for others weighs against a finding of disability.  Brown v. Barnhart, 390 F.3d 535, 541 (8th Cir. 2004).  Further, the evidence shows that, while Plaintiff was capable of following a proper diet and managing her blood sugars, she chose not to.  (Tr. 697, 781)  Thus, the undersigned finds that the ALJ properly applied SSR 82-59 and found that Plaintiff failed to follow prescribed treatment and was therefore not disabled.

### C.  Whether the RFC Assessment was Proper

Next, Plaintiff argues that the ALJ's RFC assessment was erroneous because it lacked medical support from Plaintiff's physicians.  The Court disagrees.  Residual Functional Capacity

(RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted).  RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations.  20 C.F.R. § 416.945(a)(1).  The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'"  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Here, the medical evidence demonstrated that Plaintiff was physically able to perform work, with a five pound restriction and a sit/stand option.  (Tr. 833, 905)  The ALJ properly relied on this evidence in formulating Plaintiff's RFC that contained physical restrictions.  Although Plaintiff maintains that the ALJ should have ordered a consultative examination, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decison.'"  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).  In addition, the ALJ found, and the record showed, that Plaintiff's impairments were directly attributable to noncompliance with treatment.  (Tr. 30-31)   An ALJ may consider noncompliance in determining a plaintiff's RFC.  Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013).  Thus, the Court finds that substantial evidence supports the ALJ's RFC determination.

### D.  Whether the ALJ Properly Relied on the VE's Testimony

Plaintiff also argues that the ALJ erred in relying on the VE's testimony because the ALJ did not resolve the conflict between the testimony and the Dictionary of Occupational Titles ("DOT") because the DOT does not provide for a sit/stand option.  While the ALJ may not rely

on VE testimony that conflicts with the DOT job classifications absent evidence to rebut those classifications, the VE may supplement the DOT with additional information. Reynolds v. Barnhart, 36 Fed. App'x 575 (8th Cir. 2002). Here, the VE acknowledged that the DOT did not determine whether a person could do the job of sorter from a sitting or standing position. However, the VE then observed that people employed as a sorter would agree that a sit/stand option was available to perform the job. Rather than conflicting with the DOT, this testimony merely supplemented the sorter position defined by the DOT. Id. Thus, the undersigned finds that the ALJ properly relied on the VE's tesimony.

### E.  Whether Substantial Evidence Supports the ALJ's Credibilty Determination

Finally, the Plaintiff contends that the ALJ's credibility determination was erroneous. The undersigned finds that substantial evidence supports the credibility findings by the ALJ. As stated above, noncompliance weighs against Plaintiff's credibility. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (stating an ALJ may use evidence of noncompliance to weigh the credibility of plaintiff's subjective complaints). Further, the Defendant correctly notes that, while Plaintiff complained of pain, she also demonstrated a history of drug-seeking behavior. (Tr. 354, 434, 564, 568, 586, 987)  Evidence of drug seeking behavior may detract from Plaintiff's credibility. See Harvey v. Barnhart, 368 F.3d 1013, 1015 (8th Cir. 2004) (finding drug seeking behavior was inconsistent with plaintiff's complaints of pain).

Additionally, the record shows that Plaintiff was able to care for her children and mother and perform other functions in the home, such as driving and shoveling snow. (Tr. 29, 31, 60, 900, 903)  "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). Further, doctors noted that they could find no objective reason to support Plaintiff's purported

level of pain and opined that Plaintiff was exaggerating her symptoms. (Tr. 31, 394, 845, 854-55, 889, 1004) The ALJ may consider exaggeration of symptoms in assessing a plaintiff's credibility. Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997). "The issue in credibility determination is not whether the claimant actually experiences pain, but whether the claimant's symptoms are credible to the extent that they preclude all substantial gainful activity." Lewis v. Astrue, No. 4:10CV1131 FRB, 2011 WL 4407728, at *20 (E.D. Mo. Sept. 22, 2011) (citing Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998)). Based on the inconsistencies in the record, the ALJ properly determined that Plaintiff's subjective complaints were not credible. As such, substantial evidence based upon the record as whole supports the ALJ's determination that Plaintiff had not been under a disability since August 5, 2009.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of September, 2014.